HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TIMOTHY IGIELSKI, et al.,

    Plaintiffs,

    v.

RIVERSOURCE LIFE INSURANCE COMPANY,

    Defendant.

CASE NO. C15-313RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the Court on Plaintiffs Timothy ("Timothy")[1] and Christopher ("Christopher") Igielski's ("Plaintiffs") Motion for Summary Judgment (Dkt. # 6) and Defendant RiverSource Life Insurance Company's ("Defendant") Motion for Summary Judgment (Dkt. # 17).  Plaintiffs seek summary judgment solely on their claim for breach of contract while Defendant brings summary judgment as to all of Plaintiffs' claims.

This case involves the Plaintiffs' claims against Defendant relating to Defendant's refusal to pay the benefits on two life insurance policies on their father, Robert Igielski ("Robert").  For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion and **GRANTS in part and DENIES in part** Defendant's Motion.

---

[1] The Court refers to the Igielskis by their first names solely for purposes of clarity – it means no disrespect to the Plaintiffs.

ORDER – 1

## II.     BACKGROUND

a. General Factual Background

Plaintiffs are the beneficiaries of two Flexible Premium Variable Life Insurance policies issued by Defendant's predecessor, IDS Life Insurance Company.[2]  *See* Dkt. # 4 ("Compl.") ¶¶ 3.1-3.3; Dkt. # 10 (Skillings Decl.) ¶ 4.[3]  The Plaintiffs are brothers and the sons of Robert.  *See* Dkt. # 7 (Timothy Decl.) ¶ 4.  The Policies were applied for in December 1991 and have a "Policy Date" of March 4, 1992.  *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 14; Dkt. # 17-4 (Skillings Decl.) Ex. 4 at 2.  At some point – Plaintiffs claim in 1993 – Robert became incapacitated.  *See* Dkt. # 17-4 (Skillings Decl.) Ex. 6.[4]  As such, Ruby Igielski, Robert's spouse, was appointed as his limited guardian and held his General-Durable Power of Attorney.  *Id.*

b. The Life Insurance Policies

   i. *The "Insured," "Owners," and "Beneficiaries" of the Policies*

Both the 6004 Policy and the 2004 Policy list Robert as the "Insured."  *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 14; Dkt. # 17-4 (Skillings Decl.) Ex. 4 at 2.  The application for the 6004 Policy also lists "Robert J. Igielski" as the "Insured" and "Timothy J. Igielski" as the "Owner" and beneficiary.  *See* Dkt. # 17-3 (Skillings Decl.) Ex. 1 at 2-4.  The application for the 2004 Policy lists "Robert J. Igielski" as the "Insured" and "Christopher T. Igielski" as the "Owner" and beneficiary.  *Id.* Ex. 3 at 38-40.

---

[2] The policies bear the Policy Nos. 0909 0285 3123 6 004 (the "6004 Policy") and 0909 0285 3139 2 004 (the "2004 Policy").  Compl. ¶ 3.1.

[3] For future reference, the Court directs the Parties to consult this Court's procedures for preparing courtesy copies.  When the aggregate submission to this Court exceeds 50 pages, a paper copy "with tabs or other organizing aids as necessary" should be delivered to the Clerk's office.  *See* Hon. Richard A. Jones, General Motions Practice located at: http://www.wawd.uscourts.gov/sites/wawd/files/JonesGeneralMotionsPractice.pdf.  No such tabs or other organizational aids accompany Defendant's filings.

[4] Plaintiffs assert that Robert suffered a stroke in 1993, which caused his incapacity.  *See* Dkt. # 25 at 9.

ORDER – 2

### ii. *The Terms of the Policies*

The terms of both Policies are largely identical. The Policies call for payment of the policy proceeds upon either maturity of the policy or proof of the insured's death during the policy term. *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 14. The Policies are governed by the Washington law. *See id.* at 21 (indicating law of the state in which policy was delivered governs the contract).

The Policies also provided certain other, relevant terms, such as:

**When will the policy become incontestable?**

After this policy has been in force during the insured's lifetime for two years from the policy date, we[5] cannot contest the policy except for nonpayment of premiums.

*Id.*

The Policies clarify that they may terminate upon the earliest of five separate events occurring:

1. the date you[6] request that coverage ends; or
2. the date you surrender the policy in full; or
3. the end of the grace period; or
4. the death of the insured; or
5. the maturity date

*Id.* at 22.

As the Policies clarify, a "grace period" for paying premiums exists. *Id.* at 25. As the Policies explain:

Yes. If on a monthly date, the cash surrender value is less than the monthly deduction for the policy month following such monthly date, a grace period of 61 days will begin. (The monthly deduction is described in the Policy Values section.) The grace period will give you time to pay a premium sufficient to continue your coverage. We will mail, to your last known address, a notice as to the premium needed so that the estimated cash surrender value will be sufficient to cover the next three monthly deductions.

---

[5] The Policies define "we, our, us" as "IDS Life Insurance Company," Defendant's predecessor. *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 20.

[6] The Policies define "you" and "your" as "[t]he owner of this policy." *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 20.

ORDER – 3

>If such premium is not paid within the grace period, all coverage under this policy will terminate without value at the end of the 61-day grace period.

*Id.* at 25.

### iii. The Addresses of the Policies

The application forms for both policies ask only for the address of the "owner" of the policy. *See* Dkt. # 17-3 (Skillings Decl.) Ex. 1 at 3, Ex. 3 at 39. Thus, the application for the 6004 Policy lists a mailing address for Timothy at 19733 38th Pl. S., SeaTac, WA (*see id.* Ex. 1 at 3) and a mailing address for Christopher at 31214 55th Ave. S., Auburn, WA (*see id.* Ex. 3 at 39). The only other address in the application form itself is for the address of the insured's primary care physician. *See id.* Ex. 1 at 6, Ex. 3 at 42; *see also* Dkt. # 17-1 (Skillings Decl.) ¶¶ 9-10. Nevertheless, Robert provided his address – the same 31214 55th Ave. S. address as Christopher's – on a medical form provided as part of the underwriting process. *See* Dkt. # 17-4 (Skillings Decl.) ¶ 9, Ex. 5 at 26. Defendant asserts that it has never received any formal request for or notification of a change of address for Robert. *See* Dkt. # 17-1 (Skillings Decl.) ¶ 10.

Both Christopher and Timothy sent in change of address forms over the years.

Christopher sent a "Client Data Update Form" to Defendant dated March 20, 2000, requesting a change of address from the original 31214 55th Ave. S., Auburn address to P.O. Box 25290, Federal Way, WA. *See* Dkt. # 17-4 (Skillings Decl.) Ex. 7 at 34. Christopher later sent a letter dated May 22, 2002 requesting a change of address from the post-office box to 1127 NW Irving St., Portland, OR. *Id.* Ex. 8 at 36. Finally, Christopher sent Defendant a "Client Address and Phone Number Update Form" dated March 19, 2004, which listed a new permanent residence address – 4324 S. 284th St., Auburn, WA – and a mailing address at P.O. Box 24568, Federal Way, WA. *Id.* Ex. 9 at 38. The form indicated that the post-office box mailing address applied to all accounts. *Id.* Finally, it appears that sometime in 2013 Christopher again notified defendant of a change of address, requesting all future correspondence be sent to 2600 Fairview Ave. E. Slip 8, Seattle WA. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 16.

ORDER – 4

Timothy likewise sent in several change of address forms.  In February 2000, he sent in a "Client Data Update Form" requesting a change of address from 4324 S. 284th St., Auburn, WA to 4666 S. 170th St., SeaTac, WA.[7]  *See* Dkt. # 17-4 (Skillings Decl.) Ex. 10 at 40.  In September 2001, Timothy moved but failed to provide Defendant with a change of address form, causing it to send two letters regarding returned mail.  *See* Dkt. # 17-2 (Skillings Decl.) ¶ 18, Ex. 11 at 42-43.  Defendant began sending mail to 4127 S. 280th St., Auburn, WA, the address they were given by the United States Postal Service, without incident until June 2005, when Timothy sent a "Client Address and Phone Number Update Form" requesting a change to 2214 S. 308th St., Federal Way, WA for all accounts.  *See* Dkt. # 17-4 (Skillings Decl.) Ex. 12 at 46.

### *iv. The Notices of Policy Lapses for Nonpayment*

Defendant has previously sent letters to Plaintiffs regarding the nonpayment of insurance premiums.

#### 1.   The 2010 Lapses

Beginning in September 2010, Defendant began sending Timothy letters regarding insufficient payment of premiums on the 6004 Policy.  *See* Dkt. # 17-4 (Skillings Decl.) Ex. 13 at 48.  These letters were each sent to the 2214 S. 308th St., Federal Way address indicated in Timothy's last change of address.  *See id.* Ex. 13 at 48, Ex. 14 at 51, Ex. 15 at 53, Ex. 16 at 55.  Defendant sent follow up letters in November 2010 (*see id.* Ex. 14 at 51), December 2010 (*see id.* Ex. 15 at 53) and February 2011 (*see id.* Ex. 16 at 55).  Each of these letters indicated that the premium payments Defendant had been receiving was insufficient to cover the minimum premium and that during the grace period, the policy apparently had been paid from its cash surrender value.  *See id.* Ex. 15 at 53.  By December 2010, however, the cash surrender value had apparently run out and full payments were required.  *See id.*  Accordingly, the letters requested payments to bring the

---

[7] It is unclear how or when Timothy's address changed from the 19733 38th Pl. S., SeaTac, WA address given on the December 1991 application (*see* Dkt. # 17-3 (Skillings Decl.) Ex. 1 at 3) to the 4324 S. 284th St., Auburn, WA address given by Timothy in 2000.

ORDER – 5

1   policy up to date and indicated that failure to pay would cause the policy to lapse. *See id.*
2   Timothy sent payments after both the December 2010 and February 2011 letters,
3   ultimately covering the entire payment needed. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 23.

4          Similar notices were sent to Christopher in relation to the 2004 Policy starting in
5   October 2010. *See* Dkt. # 17-4 (Skillings Decl.) Ex. 17 at 58. Another letter was sent in
6   December 2010. *See id.* Ex. 18 at 60. These letters were sent to the P.O. Box 24568,
7   Federal Way address indicated in Christopher's change of address form from March
8   2004. *See id.* Ex. 17 at 58, Ex. 18 at 60. Both letters indicated that the policy had been
9   paying insurance costs from its cash surrender value, but that that was insufficient to
10  continue paying premiums. *See id.* Ex. 17 at 58. As such, the letters requested payments
11  to bring the premiums current and indicated that the policy would lapse if Defendant did
12  not receive payment. *Id.* Christopher apparently made payments on both letters,
13  ultimately bringing the policy current. *See* Dkt. # 17-2 (Skillings Decl.) ¶¶ 25, 27.

14                          2.     The 2013 Lapses

15        In 2013, Defendant once again sent out notices regarding the nonpayment of
16  premiums on the Policies.

17        The 6004 Policy entered into its grace period for nonpayment of premiums on
18  May 4, 2013.[8] *See id.* ¶ 38. A check dated May 15, 2013 from a Charles Schwab
19  account was then sent, bearing the notation "FBO TIMOTHY IGIELSKI." *See* Dkt. #
20  17-5 (Skillings Decl.) Ex. 27 at 24. This amount was insufficient to pay the full amount
21  of the past premiums owed. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 38. As a result, in June
22  2013, Defendant once again sent a notice to Timothy stating that the premium payments
23  it was receiving were insufficient to cover the minimum premiums on the 6004 Policy.
24  *See* Dkt. # 17-5 (Skillings Decl.) Ex. 28 at 27. On a letter dated the same day, Defendant
25  also sent a notice enclosing certain information regarding alternatives to lapse or

---

27  [8] It is unclear whether Defendant sent a notice to Timothy that the 6004 Policy had entered into its grace period.

28  ORDER – 6

surrender. *See id.* Ex. 29 at 30-33. Both of these letters were addressed to the 2214 S. 308th St., Federal Way address. *See id.*

On July 6, 2013, the 6004 Policy lapsed. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 41. Defendant sent Timothy a letter reflecting this dated July 9, 2013, stating that it had not received a premium payment within the grace period, meaning that the 6004 Policy had terminated. *See* Dkt. # 17-5 (Skillings Decl.) Ex. 30 at 35. It also stated that Timothy could reapply for coverage if the 6004 Policy had a reinstatement provision. *Id.* This letter was sent to the 2214 S. 308th St., Federal Way address. *Id.*

In Christopher's case, the 2004 Policy entered into its grace period[9] on May 4, 2013.[10] *See* Dkt. # 17-2 (Skillings Decl.) ¶ 29. Defendant sent a letter dated July 8, 2013 stating that the payments it was receiving were insufficient to pay the minimum premiums on the 2004 Policy. *See* Dkt. # 17-5 (Skillings Decl.) Ex. 20 at 2. On a letter dated the same day, Defendant enclosed information regarding alternatives to lapse or surrender. *See id.* Ex. 21 at 5-8. Both letters were addressed to Robert rather than Christopher and both were sent to Christopher's 2600 Fairview Ave. E. Slip 8, Seattle address. *See id.* at 2-8.

Christopher did not respond to Defendant's letters, causing the 2004 Policy to lapse on August 8, 2013. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 32. As such, Defendant sent a letter dated August 9, 2013 – this time addressed to Christopher at the 2600 Fairview Ave. E. Slip 8, Seattle address – stating that it had not received a premium payment for the 2004 Policy before the grace period expired and that the 2004 Policy had lapsed. *See* Dkt. # 17-5 (Skillings Decl.) Ex. 22 at 10.

---

[9] It is unclear whether Defendant sent Christopher a notice indicating that the 2004 Policy had entered into its grace period.

[10] Christopher apparently sent a check dated March 15, 2013 that was insufficient to pay the full amount of the past premiums owed. *See* Dkt. # 17-2 (Skillings Decl.) ¶ 29. The attached exhibit, however, bears the notation "FBO TIMOTHY IGIELSKI" and is a copy of the check attached as exhibit 27. *See* Dkt. # 17-4 (Skillings Decl.) Ex. 19 at 63.

ORDER – 7

    c.   <u>Robert's Death And Plaintiffs' Efforts to Claim the Policies' Benefits</u>

Robert passed away on August 10, 2013. *See* Dkt. # 17-1 (Tucker Decl.) Ex. 1 at 4; Dkt. # 7 (Timothy Decl.) ¶ 4. Plaintiffs first sought to claim the Policies' benefits by contacting Lori Cousineau, their Ameriprise agent, via email on September 23, 2013. *See* Dkt. # 17-1 (Tucker Decl.) Ex. 2 at 6-7.

In a follow up email, Christopher indicated that he had just discovered that the Policies had become inactive.[11] *See id.* at 6. Both Christopher and Timothy sent checks to Defendant dated September 25, 2013 for $14,685.77 and $14,574.44, respectively. *See* Dkt. # 17-5 (Skillings Decl.) Ex. 23 at 13-14, Ex. 31 at 38-39. In letters dated September 30, 2013 and October 2, 2013 addressed to Timothy (at the 2214 S. 308th St., Federal Way address) and Robert (at the 2600 Fairview Ave. E. Slip 8, Seattle address), respectively, Defendant stated that it had received the checks but that it could not apply those payments unless the Policies were reinstated, but that reinstatement could be requested. *See id.* Ex. 24 at 16-17, Ex. 32 at 41-42. In follow up letters dated October 14, 2013 and October 18, 2013, this time addressed to Christopher (again at the 2600 Fairview Ave. E. Slip 8, Seattle address) and Timothy (at the 2214 S. 308th St., Federal Way address), Defendant stated that reinstatement was not an option because Robert had passed away. *See id.* at Ex. 25 at 19, Ex. 33 at 44.

    d.   <u>Correspondence Between Defendant and Plaintiffs' Counsel</u>

The Parties continued to correspond on the issue, and by early January 2014, Plaintiffs retained counsel to pursue their claims. *See id.* Ex. 26 at 21-22, Ex. 34 at 46, Ex. 35 at 48, Ex. 36 at 50. Counsel for Timothy requested that Defendant submit proof of sending the required notices to him in writing via a letter dated January 4, 2014. *See id.* Ex. 36 at 50. Defendant sent a response enclosing those responses on January 27, 2014. *Id.* Ex. 37 at 53.

---

[11] Although Ms. Cousineau's emails state that both Christopher and Timothy received the notices regarding the missed premium payments, those statements are hearsay not within any exception. Fed. R. Evid. 801 & 802.

ORDER – 8

Months later, counsel representing both Plaintiffs sent a letter dated October 8, 2014 to Defendant, informing Defendant that they had been retained in the matter and requesting copies of the Policies and any correspondence exchanged between the Parties. *See id.* Ex. 38 at 55. A follow up letter was sent dated November 3, 2014, invoking the Washington Insurance Fair Conduct Act ("IFCA"). *See id.* Ex. 39 at 57. Another letter was sent on December 9, 2014, arguing that notice must have been mailed to Robert under RCW 48.19.290 and demanding immediate payment of all benefit proceeds with interest and attorneys' fees. *See id.* Ex. 40 at 59-60. Finally, later that month, Plaintiffs' counsel formally gave notice through the Washington Office of the Commissioner of their claim. *Id*. Ex. 41 at 62-63. Defendant responded to counsel's letters on January 30, 2015. *Id.* Ex. 42 at 65.

This suit followed, with Plaintiffs alleging claims for breach of contract, bad faith, negligence, and for violations of the IFCA and Consumer Protection Act ("CPA"). *See* Compl. ¶¶ 4.1-8.5. The basis for these claims appears – at least according to the Complaint – to be based primarily on Defendant's failure to deliver notice of cancellation to Robert prior to August 10, 2013 and to distribute benefit proceeds. *See id.* ¶¶ 3.6-3.7.

### III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets

ORDER – 9

the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

## IV. ANALYSIS

a. <u>Evidentiary Issues</u>

Before proceeding to the merits of the underlying motions, the Court believes it must address an issue that is unfortunately not addressed by the Parties: some of the evidence presented to this Court contains evidence that could well be inadmissible for this Court's consideration. It is, of course, hornbook law that a court can only consider admissible evidence on a motion for summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

For example, Plaintiffs seek to introduce the contents of an October 23, 2013 letter from Christopher to Defendant's employee, George Tsafaridis, as fact by having Christopher simply declare them as "true and accurate and [] based on personal knowledge." *See* Dkt. # 25 at 8-9 n.2. But the statements contained in the letter are hearsay not within any exception,[12] regardless of whether Christopher affirms their accuracy. *See* Fed. R. Evid. 801 & 802; *see also United States v. Castro-Cabrera*, 534 F. Supp. 2d 1156, 1162 (C.D. Cal. 2008) (holding that a party may not "not offer his own statements as party admissions, as only statements offered against a party-opponent are admissible under Federal Rule of Evidence 801(d)(2)"). The vast majority of Defendant's documentary evidence, in contrast, likely qualifies for the business records

---

[12] Defendant at least alludes to an objection, suggesting that Christopher's statement is unsubstantiated. *See* Dkt. # 27 at 9 n.1. Presumably, this objection would be to Christopher's lack of personal knowledge of these payments (*see* Fed. R. Evid. 602), which may have substantial merit as the Policies themselves indicate that the "Initial Premium" on the Policies was $827.50 per month in 1992 (*see* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 13, Dkt. # 17-4 (Skillings Decl.) Ex. 4 at 4).

ORDER – 10

exception (*see* Fed. R. Evid. 803(6)) given that Defendant's custodian has testified as to their provenance (*see* Dkt. # 17-2 (Skillings Decl.) ¶¶ 2-3).

The Court will not second guess the Parties' apparent decision to seemingly not object to any evidence (including, apparently, the letters entitled "Notice of Cancellation and Refund" previously subject to a motion to strike). *See* Dkt. # 22 at 7. Instead, because the Court does not rely upon the evidence it finds questionable, it declines to rule as to their admissibility at this juncture. *Cf. Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 68 F. Supp. 3d 1170, 1172-73 (C.D. Cal. 2014) (declining to address evidentiary issues on summary judgment because the court did not rely on evidence subject to objection).

    b. <u>Plaintiffs' Breach of Contract Claim</u>

        i. *Application of RCW 48.18.290*

After much ink has been spilled, the Parties' arguments remain squarely focused on the proper application of RCW 48.18.290 (though Plaintiffs raise several other issues in connection with their other claims in opposition to Defendant's Motion).[13] That statute, in pertinent part, reads:

> (1) Cancellation by the insurer of any policy which by its terms is cancellable at the option of the insurer, or of any binder based on such policy which does not contain a clearly stated expiration date, may be effected as to any interest only upon compliance with the following:
>
> . . .
>
> (c) If an insurer cancels a policy described under (a) or (b) of this subsection for nonpayment of premium, the insurer must deliver or mail the cancellation notice to the named insured at least ten days before the effective date of the cancellation.
>
> . . .
>
> (5) This section shall not apply to contracts of life or disability insurance without provision for cancellation prior to the date to which premiums have been paid, or to contracts of insurance procured under the provisions of chapter 48.15 RCW.
>
> RCW § 48.18.290.

---

[13] Indeed, much of the reason this Court renoted the two motions for summary judgment for the same date was because of its understanding that the application and interpretation of RCW 48.18.290 would be the sole focus of the Parties' briefs. *See* Dkt. # 23 at 4.

ORDER – 11

Before determining whether a genuine issue exists as to whether Defendant sent notices complying with the policy to Robert, the Court must determine whether the Policies are even subject to these statutory notice requirements. As is clear, RCW 48.18.290 expressly does not apply to "contracts of life or disability insurance without provision for cancellation prior to the date to which premiums have been paid." RCW § 48.18.290(5).

Defendant contends that the Policies fall under this exception. *See* Dkt. # 17 at 14. The Court agrees. The plain language of the exception provides that the notice requirements contained in RCW § 48.18.290 do not apply to life insurance policies that cannot be cancelled prior to the last day for which premiums have been paid.

In interpreting a similar contract, the court in *Graham-Bingham Irrevocable Trust v. John Hancock Life Ins. Co. USA*, held that a life insurance policy fell under the exception when the only section governing termination allowed it "for only non-payment of a premium, surrender of the Policy by the insured, or death of the insured." 827 F. Supp. 2d 1275, 1282 (W.D. Wash. 2011). In that case, there similarly was a difference between the "named insured" and "owner" of the policy – specifically, the insured was an individual while the owner was a trust. *See id.* at 1278-79. The trust arranged for a third party, Trudeau, to pay the premiums on the policy, but the check presented was dishonored for insufficient funds. *Id.* at 1278. The insurer thus declared the policy lapsed, but apparently only after finally linking the dishonored check to the policy months later. *Id.* at 1278-79, 1280. Upon discovery, the insurer sent a lapse notice to the trust. *Id.* at 1280. There is no indication that notice was ever given to the insured.

The court held that RCW 48.18.290's notice provisions did not apply to the life insurance policy in question because it was exempt under RCW 48.18.290(5). *Id.* at 1282. Specifically, the court noted that there was no provision in the policy that would permit the *insurer* to cancel the policy, except for nonpayment of premiums. *See id.* As

ORDER – 12

such, the court rejected the trust's effort to bring a standalone claim for violation of the notice provisions. *Id.*

The situation in *Graham-Bingham Irrevocable Trust* is practically identical to the situation here. Here, the Policies explicitly state that "[a]fter this policy has been in force during the insured's lifetime for two years from the policy date" – the policy date on both Policies is March 4, 1992 – "[Defendant] cannot contest the policy except for nonpayment of premiums." Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 21. In other words, by the express terms of the Policies, by March 4, 1994, Defendant *could not contest the Policies for any reason* except for nonpayment of premiums, squarely bringing it within the confines of RCW 48.18.290(5). Perhaps to emphasize the point, the Policies specify the few specific situations where they could terminate: only when the owners of the policy request or surrender the policy, the end of the grace period for nonpayment of premiums, the insured dies, or the maturity date is reached. *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 22.

Plaintiffs insist that a provision in the Policies permitting *Plaintiffs* to cancel the Policies takes them out of the exception. *See* Dkt. # 25 at 13. Specifically, Plaintiffs point out that documents entitled "Notice of Cancellation and Refund" provided with the Policies permitted Plaintiffs to "return [their] policy for surrender at any time and to receive, in cash, the cash surrender value of [their] policy at the time of surrender." *See* Dkt. # 19-1 (Feldman Decl.) Ex. 1 at 23-24, 77-78. The Policies also attached documents entitled "Notice of Withdrawal Right" which permitted Plaintiffs to "return [their] policy for cancellation, and receive a full refund of all premiums paid, at any time within 10 days from delivery of the policy or 45 days from the date the application was signed, whichever is later." *See id.* at 25, 79. Plaintiffs therefore assert that "RCW 48.18.290(5) does not focus solely on whether the insurer is able to cancel the policy," and that Defendant was therefore required to provide a notice of cancellation to Robert ten days prior to the termination of the Policies. *See* Dkt. # 25 at 13-14.

ORDER – 13

The Court disagrees. RCW 48.18.290 is entitled "Cancellation by insurer."[14] It would be rather incongruous to interpret any part of that section referring to "provision to cancellation" as applying to both the insurer and the owner or insured. But more to the point, giving full effect to Plaintiffs' interpretation would render whole requirements from other statutes superfluous. RCW 48.76.020 requires that all life insurance policies must contain a provision allowing the owner to surrender the policy. Likewise, RCW 48.23.020 and 48.23.050 require every life insurance policy, with a few exceptions, to contain a provision stating that the policy will "be incontestable after it has been in force for during the lifetime of the insured for a period of two years from its date of issue."[15] If life insurance policies containing provisions permitting cancellation by the policy owners did not qualify for the exception in RCW 48.18.290(5), then no life insurance policy could qualify.

"When two statutes appear to conflict, the rules of construction direct the court to, if possible, reconcile them so as to give effect to both provisions." *Bailey v. State*, 191 P.3d 1285, 1291 (Wash. Ct. App. 2008) (citing *King v. Dep't of Social & Health Servs.*, 756 P.2d 1303, 1307 (Wash. 1988)); *see also Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1070 (9th Cir. 2010) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("'when two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective.'"). The more natural reading, then, of RCW 48.18.290(5) is that a "provision for cancellation" refers only to provisions for cancellation by the insurer, not to mandatory provisions for "cancellation" by the owners of the policy. This makes sense, given that numerous courts have held that "[t]he term 'cancellation' refers to a unilateral act of *the insurer* terminating coverage during the policy term." *Johnson v.*

---

[14] Courts are often instructed that "the title of a statute or section can aid in resolving an ambiguity in the legislation's text." *See I.N.S. v. Nat'l Ctr. For Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) (citing *Mead Corp. v. Tilley,* 490 U.S. 714, 723; *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388-89 (1959)); *State v. Lundell*, 503 P.2d 774, 775-76 (Wash. Ct. App. 1972).

[15] RCW 48.23.380 also requires every policy to have a notice informing policy owners of their right to return the policy within 10 days of receipt for a refund of the premium paid.

ORDER – 14

*Safeco Ins. Co. of Am.*, 316 P.3d 1054, 1060 (Wash. Ct. App. 2013) (quoting *Safeco Ins. Co. v. Irish*, 681 P.2d 1294, 1296 (Wash. Ct. App. 1984)) (emphasis added).

Under the terms of the Policies, when the policy entered its grace period, Defendant was required to "mail, to your last known address, a notice as to the premium needed so that the estimated cash surrender value will be sufficient to cover the next three monthly deductions." *See* Dkt. # 17-3 (Skillings Decl.) Ex. 2 at 25. There is no genuine dispute of material fact that Defendant mailed notices to both Plaintiffs at their last known addresses, thereby satisfying this term. *See* Dkt. # 17-5 (Skillings Decl.) Ex. 20 at 2, Ex. 28 at 27.

>       ii. *Whether Genuine Issues Exist As To the Breach of Contract Claim*[16]

Plaintiffs argue that even if summary judgment is granted in Defendant's favor on the proper application of RCW 48.18.290, summary judgment should be denied as to their breach of contract claim because, they contend, factual issues remain concerning nonpayment. *See* Dkt. # 25 at 17.

Plaintiffs contend that the evidence they present creates a genuine issue of material fact regarding whether any nonpayment was caused by Plaintiffs or by Defendant or its service provider. *See id.* They cite, extensively, to Christopher's letter to Mr. Tsafaridis as proof that they paid or that their parents had "other Ameriprise account(s) that could have paid any insurance payments owing." *See id.* (quoting Dkt. # 19 (Feldman Decl.) Ex. 1 at 5). As discussed, *supra*, those statements are hearsay not within any exception

---

[16] Defendant correctly argues that generally, parties may not assert new theories at the last minute to avoid summary judgment. *See Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017, 1037 (C.D. Cal. 2012) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000)); *cf. Amaker v. King Cnty.*, 479 F. Supp. 2d 1151, 1157 (W.D. Wash. 2007). And Defendant correctly points out that several of the theories Plaintiffs now assert are not contained in their Complaint.

In part, the reasoning behind this principle is that allowing a plaintiff to "oppose summary judgment based on a new theory of liability . . . would essentially blind side the defendant with a new legal issue after the bulk of discovery has been completed." *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal. 2010) (citing *Coleman*, 232 F.3d at 1292-93). Those concerns are less apparent here, where little discovery has taken place. As such, the Court declines to preclude Plaintiffs' arguments solely on these procedural grounds.

ORDER – 15

and do not create a genuine issue for purposes of summary judgment. *See Orr*, 285 F.3d at 773.

Finally, Plaintiffs request that the Court defer ruling on or simply deny Defendant's Motion on this issue at this time because they have not had adequate time to conduct discovery. *See* Dkt. # 25 at 18. Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow additional time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." *See also Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortgage Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Generally speaking, "[t]he requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc.*, 525 F.3d at 827 (citing *Cal. On behalf of Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)).

Plaintiffs provided affidavits in support of their Motion to Continue RiverSource's Summary Judgment Motion Under Rule 56(d). *See* Dkt. # 18. Plaintiffs contend that they need additional discovery regarding whether they or their parents failed to pay the policy premiums, whether Defendant correctly determined premium amounts, whether nonpayment was caused by Defendant or its service provider, and whether other accounts were available to pay the premiums. *See* Dkt. # 25 at 18. They also provide some examples of the discovery requests they propounded on Defendant. *See* Dkt. # 19-2 (Feldman Decl.) Ex. 3 at 9-17.

The Court expresses some doubt as to Plaintiffs' justification for additional discovery. For example, without proof that the Plaintiffs' parents gave explicit authorization for any transfers from their other accounts to pay for their life insurance premiums, any agent of Defendant making such an unauthorized transfer could

ORDER – 16

potentially be liable for bank fraud. *See* 18 U.S.C. § 1344. Alternatively, it seems eminently clear that Plaintiffs would have equal, if not better, access to their (and their parents') payment records on the Policies. Nevertheless, in the interests of justice, the Court finds that Plaintiffs have provided sufficient justification for additional discovery on this claim. As such, the Court will **DENY** Defendant's Motion and grant additional discovery at this time.

### c. Whether Genuine Issues of Material Fact Exist As to Plaintiffs' Other Claims

In addition to their claim for breach of contract, Plaintiffs also bring claims for bad faith, negligence, and for violations of the IFCA and CPA. Defendant has requested summary judgment on those claims by virtue of the Court's ruling on the proper application of RCW 48.18.290. *See* Dkt. # 17 at 22-28. Plaintiffs argue that factual issues exist as to those claims to preclude summary judgment or that they have substantial justification for seeking additional discovery on those claims. *See* Dkt. # 25 at 18-29.

Excluding Plaintiffs' arguments relying upon their interpretation of RCW 48.18.290(1)(c), Plaintiffs aver that Defendant violated the IFCA and committed bad faith by: (1) failing to conduct a reasonable investigation as to alleged payment issues from their financial advisors, and (2) by failing to promptly respond to letters from Plaintiffs and their counsel beginning in October 2013. *See* Dkt. # 25 at 21-23. They argue that factual issues exist as to their CPA and negligence claims regarding: (1) Defendant's failure to conduct a reasonable investigation, (2) whether the cumulative premiums paid equal or exceed the policy benefits, and (3) whether Defendant exercised ordinary care in denying Plaintiffs' claim for benefits under the Policies. *See id.* at 23-25.

The Court expresses some doubts as to these arguments. Plaintiffs cite their own letters to show that payment issues arose (*see id.* at 21), but those statements are hearsay not within any exception (*see* Fed. R. Evid. 801 & 802). Their argument that Defendant's single statement that it was "not aware of any alleged payment error between

ORDER – 17

your parents and their financial advisors" constitutes a failure to conduct a reasonable investigation (*see* Dkt. # 17-5 (Skillings Decl.) Ex. 35 at 48) requires a rather tortured reading of Defendant's letter. Additionally, it is unclear why Defendant should have been obligated to investigate payment irregularities from Plaintiffs' financial advisors, Charles Schwab, not Ameriprise (or some other entity affiliated with Defendant). *See id.* Ex. 27 at 24 (evidence payment from Charles Schwab); Dkt. # 17-1 (Tucker Decl.) Ex. 2 at 6 ("These premium payments had been set up as auto-pay items through Schwab. We are still trying to figure out what happened there.").

Nevertheless, the Court finds that Plaintiffs have presented sufficient justification to warrant additional discovery on these claims. Access to the Defendant's claims files may shed additional light on the process by which Defendant denied Plaintiffs' claims, including a fuller accounting of Plaintiffs' payments (or non-payments, as it were), though Plaintiffs certainly already have access to evidence of their own payments. Defendant's claims files may also reveal information regarding Defendant's claims handling processes and whether they conducted a reasonable investigation into Plaintiffs' claims.

///

///

///

ORDER – 18

## V. CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (Dkt. # 6), and **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment (Dkt. # 17). The Parties are **HEREBY ORDERED** to meet and confer **within fourteen (14) days of this Order** to discuss a proposed case schedule, with Plaintiffs to file a joint status report reflecting the joint status report topics listed in the Court's previous Order (Dkt. # 8) **not to exceed seven (7) pages within seven (7) days** of the Parties' conference. The Court's previous Order staying discovery is lifted. *See* Dkt. # 23.

DATED this 30th day of November, 2015.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Court

ORDER – 19